**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**


| | | |
|---|---|---|
| DELORES M. KARNOFEL, | ) | CASE NO.  4:10-CV-766 |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE NUGENT |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| MICHAEL J. ASTRUE, | ) | VECCHIARELLI |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | **REPORT & RECOMMENDATION** |

Plaintiff, Delores M. Karnofel, *pro se*, challenges the final decision of Defendant,

Michael J. Astrue, Commissioner of Social Security (the "Commissioner"), denying

Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance

Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of

the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* (the "Act").  This Court

has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the

Commissioner's final decision be AFFIRMED, and that judgment be entered in favor of

the Commissioner.

## I.   PROCEDURAL HISTORY

On March 28, 2006, Plaintiff filed applications for DIB and SSI alleging a disability onset date of September 1, 2000.  (Tr. 44.)  The applications were denied initially and upon reconsideration.  (Tr. 44.)  Plaintiff thereafter requested a hearing before an administrative law judge ("ALJ").  (Tr. 44.)  Plaintiff's hearing was scheduled for April 28, 2009.  (Tr. 44.)  Plaintiff requested that the hearing be postponed, but her request was denied and she was informed that she was expected to attend.  (Tr. 44.)

Plaintiff's hearing was held on April 28, 2009, but Plaintiff did not attend.[1]  (Tr. 44.)  A vocational expert ("VE") attended the hearing, however, and testified.  (Tr. 44.)  The ALJ determined that Plaintiff had waived her right to personally appear and decided the case on the record before him.  (Tr. 44.)  The ALJ also noted that he would not reopen a prior application for benefits that Plaintiff had filed and that was denied on May 21, 2003.  (Tr. 44.)  On May 13, 2009, the ALJ found Plaintiff not disabled.  (Tr. 53.)

On March 5, 2010, the Appeals Council declined to review the ALJ's decision.  (Tr. 1.)  Therefore, the ALJ's decision became the Commissioner's final decision.  (Tr.

---

[1] Plaintiff suggests in her Reply Brief that she was unable to attend her hearing because her hypothyroidism and mercury toxicity made her unable to drive for one hour and forty-five minutes in the hot sun to the hearing.  (Pl.'s Reply 6.)  At the hearing, the ALJ addressed Plaintiff's absence from her hearing as follows:

> This is a case where claimant has repeatedly asked for postponements that have been denied.  She's not . . . here today and I find that she has not shown good cause for not being here.  Accordingly, I'm going to have a hearing in her absence.

(Tr. 13.)

1.)  On April 13, 2010, Plaintiff filed her complaint in this Court.  (Doc. No. 1.)  On July

7, 2010, the Commissioner filed his Answer (Doc. No. 11) and the Transcript of

Proceedings before the Social Security Administration (Doc. No. 12).  On August 2,

2010, Plaintiff filed a Response to the Commissioner's Answer.  (Doc. No. 13.)  Plaintiff

attached additional medical evidence to her Response that was obtained after the ALJ

made his decision.  (Doc. No. 13.)

On August 2, 2010, Plaintiff filed her Brief on the Merits.  (Doc. No. 14.)  On

October 22, 2010, the Commissioner filed his Brief on the Merits.  (Doc. No. 20.)  On

November 5, 2010, Plaintiff filed a Reply Brief.  (Doc. No. 23.)

In Plaintiff's Brief on the Merits and Reply Brief, Plaintiff recites much of the

record medical evidence; baldly asserts that adverse medical evidence is inaccurate or

the product of lies; contends that substantial evidence supports the conclusion that

Plaintiff is disabled; and offers allegedly new evidence to support the conclusion that

Plaintiff is disabled.  Plaintiff does not clearly articulate the proper legal theories upon

which she seeks relief.  However, *pro se* plaintiffs enjoy the benefit of a liberal

construction of their pleadings and filings.  *Boswell v. Mayer*, 169 F.3d 384, 387 (6th

Cir. 1999).  Accordingly, the Court construes Plaintiff's Brief on the Merits and Reply

Brief to set forth three main arguments:  (1) the Commissioner's final decision was not

based on the proper legal standards; (2) the Commissioner's decision is not supported

by substantial evidence; and (3) remand is necessary pursuant to sentence six of 42

U.S.C. § 405(g) so that Plaintiff may offer additional evidence in support of the

conclusion that she is disabled.[2]

## II.    EVIDENCE

### A.    Personal and Vocational Evidence

Plaintiff was forty-one years old on the alleged disability onset date.  (Tr. 51.)

She has at least a high school education and is able to communicate in English.  (Tr.

51.)  Plaintiff's past relevant work experience includes work as a legal secretary and

administrative assistant.  (Tr. 14.)

### B.    Medical Evidence

#### 1.    Knee, Hip, and Back Pain

On February 6, 1997, Dr. Peter J. Brooks wrote a "To Whom It May Concern"

letter indicating that Plaintiff had presented to him on at least one other occasion with

complaints of bilateral knee pain.  (Tr. 676.)  Dr. Brooks diagnosed Plaintiff with

chondromalacia[3] of the patella caused by prolonged standing and walking during

Plaintiff's past job as a tour guide.  (Tr. 676.)  Dr. Brooks indicated that "It would be

inadvisable for her to return to her previous job" because "she would be unable to stand

and walk for prolonged periods of time and it would certainly aggravate her condition."

(Tr. 676.)  Dr. Brooks concluded that Plaintiff should "return to more sedentary

secretarial duties to alleviate her knee pain."  (Tr. 676.)

---

[2] Plaintiff seeks an oral hearing or evidentiary hearing "to submit new evidence to substantiate her case of disability."  (Pl.'s Br. 2, 12.)  The Court construes this as a request for remand to enable the Social Security Administration to consider the additional evidence Plaintiff offers.

[3] Chondromalacia is the "softening of the articular cartilage, most frequently in the patella."  Dorland's Illustrated Medical Dictionary 356 (30th ed. 2003).

On June 16, 2004, Plaintiff saw Dr. Michael Jurenovich, D.O., for an orthopedic consultation regarding her right-knee pain.  (Tr. 578, 678.)  Dr. Jurenovich indicated that Plaintiff reported injuring her knee while shopping.[4]  (Tr. 640.)  Dr. Jurenovich diagnosed a torn meniscus of the right knee with effusion, although "Lachman and drawer maneuvers [were] negative in the right knee," and "X-rays reviewed from last month were negative."  (Tr. 578, 678.)  Dr. Jurenovich offered Plaintiff a cortisone injection but Plaintiff deferred.  (Tr. 578, 640, 678.)  Dr. Jurenovich instead gave Plaintiff a knee brace and a TENS unit.[5]

On June 30, 2004, an MRI of Plaintiff's right knee showed an intact meniscus. (Tr. 661.)

On July 7, 2004, Dr. Jurenovich noted the following.  Plaintiff was doing well following her recent knee injuries.  (Tr. 643.)  On July 26, 2004, Plaintiff still complained of mild right knee pain, but she deferred surgical intervention at that time.  (Tr. 644.) On September 1, 2004, Plaintiff desired therapy for her knee.  (Tr. 647.)

On September 2, 2004, Plaintiff underwent a physical therapy evaluation at Doeberling-Muccio Physical Therapy, Inc., for Medicaid certification.  (Tr. 659.)  The

---

[4] Plaintiff explains that she injured her knee (as well as her neck, back, shoulder, and hand) when she was driving an electric shopping cart at the store, the shopping cart malfunctioned and hit a shelf, and Plaintiff's knee hit the cart's steering column.  (Pl.'s Br. 4; Pl.'s Reply 2; *see also* Tr. 534.)

[5] "TENS" stands for "transcutaneous electrical nerve stimulation."  The Merck Manual of Diagnosis and Therapy 2495 (Mark H. Beers, MD., & Robert Berkow, M.D., eds., 7th ed. 1999).  The treatment uses low-frequency electrical currents to stimulate nerves and reduce pain.  *Id.*

physical therapist[6] indicated the following in a paragraph titled "Subjective Findings." Plaintiff's knee pain was intermittent and rated at 9 out of 10 in severity.  (Tr. 659.) Plaintiff was limited in her ability to walk and could stand for only approximately 3 to 5 minutes.  (Tr. 659.)  Plaintiff's left knee hurt from compensating for her right knee.  (Tr. 659.)

The physical therapist indicated the following in a paragraph titled "Objective Findings."  The strength in Plaintiff's right quad and hamstrings was rated at 4 out of 5. (Tr. 659.)  Plaintiff's range of motion in both of her knees was within normal limits and her knees exhibited good stability.  (Tr. 659.)

The physical therapist reported that Plaintiff presented with crutches, Plaintiff's gait pattern with her crutches was very poor, and Plaintiff was over-dependent on her crutches.  (Tr. 659.)  The physical therapist also noted that Plaintiff's gait without crutches on the parallel bars was "fair," that is, Plaintiff could walk approximately fifteen feet "with minimal to moderate antalgic gait."  (Tr. 659.)

On May 9, 2006, Plaintiff presented to Dr. Joseph Cerimele, D.O., for "manipulation" of her back.  (Tr. 530-31.)  Dr. Cerimele reported the following.  Plaintiff would not greet Dr. Cerimele with a handshake because she did not want to receive any germs and become infected.  (Tr. 530.)  Plaintiff walked with a limp and reported using crutches for the past two years.  (Tr. 530.)  She reported that she had been diagnosed with a meniscal tear but she refused to have it treated by an orthopedic

---

[6] The record does not clearly indicate the physical therapist's name; although the physical therapist signed his evaluation, his hand-written signature is not legible and there is no printed verification of the signature.

6

surgeon.  (Tr. 530.)  She also reported suffering from Wilson's Thyroid Syndrome and mercury poisoning.  (Tr. 530.)  Plaintiff reported that, although the Cleveland Clinic endocrinology department did not find that she suffered either Wilson's Thyroid Syndrome or mercury toxicity, a physician in Greenville, Pennsylvania and a local retired chiropractor found evidence of these disorders.  (Tr. 530.)  Plaintiff further reported that she was allergic to all medications.  (Tr. 530.)

Dr. Cerimele diagnosed Plaintiff with "only minimal lumbosacral dysfunction." (Tr. 531.)  He found Plaintiff had some diminished range of motion but full manual motor strength in the legs.  (Tr. 530.)  He observed that Plaintiff walked with a mildly antalgic gait "because she is very ginger on the right leg."  (Tr. 531.)  Dr. Cerimele warned Plaintiff that, if she indeed suffered a meniscal tear in her right knee, did not remedy it, and continued to walk as she did, she could suffer early osteoarthritic changes in her knee, alter the mechanics of her lower back, and cause problems with walking.  (Tr. 531.)

Dr. Cerimele noted that Plaintiff participated in medical care that was "outside the standard of care of medicine," which made Dr. Cerimele uncomfortable, and that he would only concern himself with Plaintiff's back.  (Tr. 531.)  Dr. Cerimele indicated that he would wait until he reviewed an x-ray of Plaintiff's back before deciding whether it would be appropriate to manipulate her back.  (Tr. 531.)

On May 31, 2006, Plaintiff presented to Dr. Jurenovich with complaints of pain in her right knee and hip.  (Tr. 679.)  Dr. Jurenovich diagnosed a torn meniscus in the right knee and right hip strain and sprain.  (Tr. 679.)  Plaintiff deferred an x-ray of her hip and "insist[ed] on seeing someone else with regards to manipulation of her right hip."  (Tr.

7

679.)  Dr. Jurenovich recommended that Plaintiff present to a "Dr. Sutton."  (Tr. 679.)

A note entered on Dr. Jurenovich's medical chart dated June 19, 2006, indicates that Dr. Sutton refused to treat Plaintiff because Plaintiff would not complete Dr. Sutton's physical examination.  (Tr. 652.)  The note indicates that Dr. Sutton reported that Plaintiff attended her examination wearing white gloves and would not touch anything.  (Tr. 652.)

On August 31, 2006, Dr. Ravinder Nath, M.D., performed a consultative examination of Plaintiff at the request of the Bureau of Disability Determination.  (Tr. 534-40.)  Dr. Nath indicated that Plaintiff reported the following.  Although Plaintiff saw Dr. Jurenovich for her knee pain, her knee still bothered her.  (Tr. 534.)  She also had constant back and right-hip pain.  (Tr. 534.)  She saw a chiropractor who put her hip into place.  (Tr. 534-35.)  She required crutches, but the crunches caused her shoulder pain.  (Tr. 534.)  She also had a sore right hand.  (Tr. 534.)  She could not take medication because she suffered allergic reactions to all medications.  (Tr. 534-35.)  She suffered sharp, localized chest pain approximately four time a week, each episode lasting approximately five minutes, and particularly when she climbed a flight of stairs.  (Tr. 534.)  She had been told that she had an underactive thyroid and suffered Wilson's Thyroid Syndrome, candidaisis, and mercury toxicity.  (Tr. 534.)  She also suffered a "galvanic current" that ran through her body when she touched certain objects, which had been attributed to the silver fillings in her teeth.[7]  (Tr. 534.)  She suffered a jolt of

---

[7]  Galvanism related to dental fillings is defined as follows:

> [P]roduction of galvanic current in the oral cavity due to the presence
> of two or more dissimilar metals in dental restorations that are bathed

electricity when she drove a car or touched certain electrical appliances.  (Tr. 534.)  She suffered a "sizzling" sensation in her jaw when she touched certain machines or slept on her metal-framed bed.  (Tr. 534.)

Dr. Nath reported that Plaintiff's "Blood pressure could not be measured due to metal in the mercury causes electric jolts."  (Tr. 535.)  Dr. Nath explained that "Initially, [Plaintiff] agreed to check the blood pressure, and when I put the cuff on, she said take it off."[8]  (Tr. 535.)  Dr. Nath indicated that Plaintiff's right knee had a range of 50%, right hip had a range of 60%, and shoulders had a range of 80%.  (Tr. 535.)  Dr. Nath also reported that Plaintiff had a history of thyroid disease, mercury toxicity, mitral valve prolapse, and back and hip pain, and stated that "Her ability to lift, etc. is affected by the above problems."  (Tr. 535.)  Dr. Nath did not provide specific functional limitations, however.  (*See* Tr. 534-40.)

On November 27, 2006, Plaintiff's chiropractor, Christopher M. Hafely, wrote a "To Whom It May Concern" letter wherein he indicated the following.  (Tr. 677.)  Plaintiff had been treated by Mr. Hafely for her lower back, hip, and knee pain.  (Tr. 677.)  A radiographic examination revealed that Plaintiff suffered a congenital four-millimeter left leg length deficiency.  (Tr. 677.)  Plaintiff was given a heel lift to wear in her left shoe to

_____

in saliva, or a single mental restoration and two electrolytes, saliva and pulp tissue fluid, thus producing an electrolytic cell and an electric current.  When such restorations touch each other, the current may be high enough to irritate the dental pulp and cause sharp pain.

Dorland's Illustrated Medical Dictionary, *supra* note 3, at 750.

[8]  Dr. Nath's notes do not indicate whether he determined that mercury caused Plaintiff to suffer electric jolts, or whether Plaintiff insisted that mercury caused her electric jolts.

correct the difference between the length of her legs.  (Tr. 677.)  Plaintiff's leg length differential had caused wear and tear on her body that contributed to her history of discomfort and pain in her lower extremities.  (Tr. 677.)

On January 5, 2007, Mr. Hafely filled out a medical source statement for the Bureau of Disability Determination.  (Tr. 590-91.)  Mr. Hafely indicated that, despite having a leg length deficiency, Plaintiff did not have limited movement in her joints and spine; had no difficulty performing gross manipulation; had a normal gait (although she used a cane to assist her walking); and had no limitations in using her extremities for functional tasks.  (Tr. 591.)

### 2. Thyroid Dysfunction

On January 21, 2004, Plaintiff contacted Dr. Mario Skugor, M.D., by telephone to ask for advice about her alleged Wilson's Thyroid Syndrome.  (Tr. 355.)  Dr. Skugor reported in a call log that he engaged in a long conversation with Plaintiff and told her that he did not believe that there was such a disorder as "Wilson's Thyroid Syndrome."[9] (Tr. 355.)  Dr. Skugor recommended that Plaintiff continue treatment with her primary doctor and keep Dr. Skugor updated on her progress.  (Tr. 355.)

On March 17, 2004, endocrinologist Dr. Michael DeRosa, M.D., drafted a letter addressed to a Dr. Luis Villaplana, M.D.,[10] reporting the results of his consultative

---

[9]  On May 9, 2006, Dr. Cerimele noted that his research of Plaintiff's complaint of Wilson's Thyroid Syndrome revealed that "Wilson's Thyroid Syndrome" did not appear to be a recognized diagnosis in any of the more accepted medical specialties," and that "it has an extensive expose in quack watch."  (Tr. 530.)

[10]  The record does not clearly indicate Dr. Villaplana's treatment relationship with Plaintiff.  On November 20, 2006, Dr. Villaplana drafted a note explaining that he had treated Plaintiff for clinical hypothyroidism.  (Tr. 582.)  That note

evaluation of Plaintiff's complaints of hypothyroidism.  (Tr. 384.)  Dr. DeRosa reported

that he was the fifth endocrinologist to whom Plaintiff has presented for her "perceived"

hypothyroidism.  (Tr. 384.)  Dr. DeRosa reported that Plaintiff's four prior

endocrinologists determined that Plaintiff did not suffer thyroid dysfunction, and that

Plaintiff became "caustic and confrontational" when he informed her that he, too,

believed that she did not suffer thyroid dysfunction.  (Tr. 384.)

On December 1, 2006, Dr. Harold Bowersox, D.O., authored a "To Whom It May

Concern" letter wherein he stated that, in August 2004 Plaintiff was prescribed T3 for a

presumptive diagnosis of Wilson's Thyroid Syndrome.  (Tr. 575.)  Dr. Bowersox

concluded that Plaintiff suffered side effects from a low dose of the T3 and, therefore,

discontinued the prescription.  (Tr. 575.)  Dr. Bowersox's letter contains no other

information about Plaintiff's medical condition.

On December 18, 2006, Dr. Paul Rosman, D.O., tested Plaintiff for thyroid

dysfunction.  (Tr. 584.)  On December 28, 2006, Dr. Rosman reported the test results

and diagnosed Plaintiff with Hashimoto's Thyroiditis.  (Tr. 583.)  Dr. Rosman noted that,

although Plaintiff's  thyroid levels were within normal limits, Plaintiff's body was making

antibodies against her thyroid.  (Tr. 583.)

On April 13, 2007, Dr. Marco Corallo, D.O., wrote a "To Whom It May Concern"

letter in which he stated that he presently treated Plaintiff for Hashimoto's Thyroiditis.

(Tr. 633, 673).  Dr. Corallo indicated that "Some symptoms of this condition include

---

provides no information about the extent of Plaintiff's condition.  Dr. DeRosa's
letter suggests that Dr. Villaplana referred Plaintiff to Dr. Rosa for a
consultative examination.  (*See* Tr. 384.)

11

forgetfulness, dry skin, constipation, throat pain, swelling of the thyroid, lethargy, hair loss, and more." (Tr. 633, 673.) Dr. Corallo did not indicate whether Plaintiff suffered any of these symptoms and, if she did, to what extent. (*See* Tr. 633, 673.)

Also on April 13, 2007, Dr. Roy E. Kerry, M.D., wrote a "To Whom It May Concern" letter in which he stated that Plaintiff had presented to his office between February and October 2002 with symptoms that were associated with a hypothyroid disorder. (Tr. 674.)

### 3. Heavy Metal Toxicity

On November 11, 2004, plaintiff presented to Dr. Hector C. Pagan, M.D., with complaints of fatigue, memory impairment, hypothyroid symptomology, myalgias, difficultly losing weight, dry skin, metallic taste, burning tongue, constipation, and insomnia. (Tr. 472.) Dr. Pagan performed a heavy metal screen of Plaintiff's hair. (Tr. 472.) The screen indicated "high levels of cadmium." (Tr. 472.) Dr. Pagan recommended that Plaintiff have all of her dental amalgams removed. (Tr. 472.)

On January 13, 2005, Plaintiff presented to Dr. Nathanial S. Doe, M.D., at The Kidney Group, Inc., for an evaluation of her renal functioning and complaints of heavy metal toxicity. (Tr. 465.) Dr. Doe reported the following. Since August 2001, Plaintiff has reported a "sizzling sensation" around her teeth and gums whenever she touched metal objects. (Tr. 465.) Plaintiff attributed this sensation to her multiple dental fillings. (Tr. 465.) She had a habit of grinding her teeth and was concerned that such grinding was releasing metal from her fillings into her body. (Tr. 465.)

Dr. Doe reported that Plaintiff had made fish a major part of her diet after an unspecified chiropractor / allergist diagnosed Plaintiff with, and treated Plaintiff for, a

12

candida infection and recommended that Plaintiff avoid ingesting dairy products.  (Tr. 465.)  Consequently, Dr. Doe continued, Plaintiff ingested a large amount of salmon.  (Tr. 465.)  Dr. Doe reported that Plaintiff believed that she may have obtained heavy metal toxicity from ingesting such large quantities of salmon.[11]  (Tr. 465.)

Dr. Doe noted that a heavy metal screening of Plaintiff's hair performed in November 2004 indicated "some traces of metal," but Dr. Doe was not certain about how to interpret the screen results.  (Tr. 465.)  Dr. Doe found that "The aluminum is slightly elevated by one point above the usual baseline . . . this is not significant."  (Tr. 466.)  Dr. Doe reported that "Objective evidence available so far shows no evidence of kidney damage from heavy metal toxicity," and concluded that Plaintiff's renal functioning was normal, pending confirmation from further chemistry reports.  (Tr. 466.)

On January 25, 2005, Dr. Pagan authored a letter for Plaintiff as evidence of medical necessity and as a request for Plaintiff to have her dental amalgam's removed.  (Tr. 472.)  Dr. Pagan recommended that, once Plaintiff's dental amalgams were removed, Plaintiff should undergo a course of chelation and detoxification therapy.  (Tr. 472.)

On February 15, 2005, Plaintiff presented to Dr. Doe for a follow-up evaluation of Plaintiff's complaints of heavy metal toxicity.  (Tr. 462.)  Dr. Doe reported that he had performed urine and blood screens for heavy metals at Plaintiff's last visit on January 13, 2005; that the urine and blood screens "revealed no evidence of heavy doses of cadmium, mercury, lead, copper, etc."; and that Plaintiff's "basic screening for heavy

---

[11]  Plaintiff states in her Reply Brief that she believes she is at risk for mercury toxicity from her dental amalgam fillings.  (Pl.'s Reply 14.)

metals in the blood and urine from our laboratory has been unremarkable." (Tr. 462.)

On February 28, 2005, Plaintiff contacted Dr. Pagan's office by telephone; the staff person who received the call reported that Plaintiff complained that she suffered a warm sensation in her chest when she was using her computer, that she could not touch metal, and that she had "certain reactions" if she touched "certain items." (Tr. 494.)  The staff person reported that Plaintiff wanted to ask Dr. Pagan if these sensations damaged her heart.  (Tr. 494.)  The staff person reported that, when she asked Plaintiff if Plaintiff had made her dental appointment to have her dental amalgams removed, Plaintiff responded that she was still saving money and that "it's on the backburner right now." (Tr. 494).

On March 22, 2005, Plaintiff contacted Dr. Pagan's office by telephone again, and the staff person who received the call reported that Plaintiff sought to change Dr. Pagan's letter of medical necessity for the removal of Plaintiff's dental amalgams.  (Tr. 495.)  The staff person reported that Plaintiff wanted Dr. Pagan to add to the letter indications that Plaintiff suffered "heart pain and galvanic current" so that she could see a cardiologist and have that visit covered by Medicaid.  The staff person told Plaintiff that she could request copies of her medical records from Dr. Pagan, wherein any mention of heart pain or galvanic current may be reviewed by other physicians.  (Tr. 495.)

On July 28, 2005, Plaintiff and Plaintiff's mother together contacted Dr. Pagan's office by telephone, and the staff person who received the call reported that Plaintiff wanted Dr. Pagan to author a letter stating that Plaintiff could not attend her Social Security hearing because of chest pain and an inability to go into the hot sun.  (Tr.

14

496-97.)  The staff person reported  that she told Plaintiff that Dr. Pagan would not write

such a letter because Dr. Pagan was not Plaintiff's treating physician, he only evaluated

Plaintiff for the purpose of establishing Plaintiff's need to have her dental amalgam's

removed, and he did not see that Plaintiff had a legitimate medical reason not to attend

the Social Security hearing.  (Tr. 496-97.)

On April 15, 2007, Plaintiff's dentist, Dr. Philip I. Plottel, D.D.S., wrote a "To

Whom It May Concern" letter indicating that Plaintiff had "a very large amount of

electro-galvanic activity in her teeth," and that the electrical readings were among the

highest that Dr. Plottel had ever seen.  (Tr. 671.)

### 4.    Heel Spurs

On July 18, 2006, Dr. David Dull, D.P.M., drafted a medical source statement

and indicated that he had evaluated and treated Plaintiff for heel spur syndrome,

plantar fasciitis, and onychomycosis from December 12, 2003, to March 6, 2006.  (Tr.

515.)  Dr. Dull reported that Plaintiff was no longer an active patient, and that she had

been uncooperative with his orthic program and treatment plan.  (Tr. 515.)  Dr. Dull

indicated that Plaintiff had no limitations in relation to her feet.  (Tr. 516.)

### 5.    Mental Impairments

On August 20, 2003, Plaintiff was evaluated by Dr. Ehab L. Sargious, M.D., at

Trumbull Memorial Hospital.  (Tr. 313.)  Dr. Ehab reported the following.  Plaintiff's

mother and sister brought Plaintiff to the emergency room the day before because

Plaintiff became threatening toward her mother and was acting paranoid.  (Tr. 313.)

Plaintiff was "pink slipped" upon admission to the emergency room because she

presented "substantial risk of physical harm to others and would benefit from treatment

15

inside the hospital." (Tr. 313.)  Plaintiff was admitted to the Psych ICU, but denied any mental problems; Plaintiff did not present any major difficulties to the hospital staff or to Dr. Sargious.  (Tr. 313.)  Dr. Sargious noted that Plaintiff had been admitted to St. Elizabeth's Hospital for a psychological problem one year prior, but Plaintiff did not adhere to any treatment recommendations made at that time and did not undergo any subsequent treatment for mental problems.  (Tr. 313.)

Dr. Sargious described Plaintiff as having a "severe thought disturbance" (Tr. 313) and diagnosed Plaintiff with "Bipolar disorder, manic with psychosis versus mixed with psychosis" (Tr. 314).  Dr. Sargious assigned Plaintiff a Global Assessment of Functioning ("GAF") score of between 15[12] and 25.[13]  (Tr. 314.)

Plaintiff was discharged from Trumbull Memorial Hospital on August 26, 2003. (Tr. 304.)  Dr. Sargious indicated in Plaintiff's discharge summary that Plaintiff had refused the treatment prescribed during her inpatient stay and that Plaintiff would be transferred to a state facility for forced medication and psychiatric stabilization.  (Tr. 304-05).  Dr. Sargious assigned Plaintiff a GAF of "around 20."  The record contains no evidence of subsequent psychiatric treatment.

---

[12]  A GAF score between 11-20 indicates some danger of hurting self or others, or occasionally failing to maintain personal hygiene, or gross impairment in communications.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

[13]  A GAF score of between 21 and 30 indicates behavior that is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas.  *See Diagnostic and Statistical Manual of Mental Disorders*, *supra*, at 34.

### 6.    State Agency Physicians' Opinions

On September 23, 2006, state agency reviewing psychologist Dr. Carl Tishler, Ph.D., performed a psychiatric review of Plaintiff.  (Tr. 541-54.)  Dr. Tishler noted that Plaintiff had been hospitalized in 2003 for bi-polar disorder and anxiety, that Plaintiff did not want to pursue the mental portion of her claim, and that there was insufficient evidence in the record to make a determination of Plaintiff's mental functioning.  (Tr. 553.)

On September 26, 2006, state agency reviewing physician Dr. Teresita Cruz, M.D., performed a physical RFC assessment of Plaintiff.  (Tr. 555-62.)  Pursuant to Acquiescence Ruling 98-4 (the "Drummond Ruling"), Dr. Cruz adopted the RFC previously found by an ALJ on August 27, 2002.  (Tr. 562.) Specifically, Dr. Cruz found that Plaintiff had the following capacities.  Plaintiff could lift or carry 50 pounds occasionally and 25 pounds frequently; and sit, stand and/or walk 6 out of 8 hours in an 8-hour workday with normal breaks.  (Tr. 556.)  Plaintiff had no limitations in pushing and pulling, except to the extent that lifting and carrying were limited.  (Tr. 556.)  Plaintiff could only occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  (Tr. 557.)  Plaintiff had no manipulative, visual, communicative, or environmental limitations.  (Tr. 558-59.)

### 7.    Plaintiff's Additional Evidence

Plaintiff attached medical records to her "Response to Defendant's Answer" that were not included in the record when the ALJ made his decision.  Plaintiff cites to this evidence in her Brief on the Merits and Reply Brief as a bases for remand.  This additional evidence is as follows.

17

A discharge report dated May 25, 1991, indicates that Plaintiff was discharged from St. Elizabeth Hospital Medical Center on that day.  (Doc. No. 13 Attach. 1, Ex. C.) It appears that a "Dr. Price" attended to Plaintiff, although the report does not indicate Dr. Price's full name or credentials.  (Doc. No. 13 Attach. 1, Ex. C.)  The report only indicates that Plaintiff was given medication for anxiety, agitation, and depression. (Doc. No. 13 Attach. 1, Ex. C.)  The report provides no indication of Plaintiff's functional abilities.

On July 26, 2010, Dr. James Nichols, D.O., authored a "To Whom It May Concern" letter that provided the following opinion:

> Upon my examination, it is my opinion that Delores is clearly unemployable. She experiences multiple problems, much of which may be related to Hashimoto's Thyroiditis.  She also has multiple symptoms that need to be further investigated.  She is a new patient to my medical practice and suffers from forgetfulness, lethargy, lack of concentration, and muscle pain, therefore is limited when walking and standing for any length of time.  She also complains of shortness of breath, and chest pain with exertion.
>
> A short interview with this patient would reveal that she is clearly unemployable.

(Doc. No. 13 Attach. 1, Ex. A.)

On July 27, 2010, physical therapist Pamela Dietelbach performed a physical RFC assessment of Plaintiff upon referral from Dr. Nichols.  (Doc. No. 13 Attach. 1, Ex. B 1-8.)  Ms. Dietelbach provided the following physical RFC assessment.  Plaintiff could sit 2 hours (although Plaintiff reportedly could sit in an armchair during her evaluation for only 1.5 minutes before her left arm began to hurt allegedly from mercury poisoning), stand 1 hour, and walk 1 hour in an 8-hour workday; lift 10 pounds frequently but never lift more than 10 pounds; perform simple grasping and fine

18

manipulation with her hands, but not push or pull; not use her feet to perform repetitive movements such as for operating foot controls; never work in unprotected heights and be around moving machinery; and frequently drive automobile equipment (although Ms. Dietelbach contemporaneously indicated that Plaintiff could not drive).  (Doc. No. 13 Attach. 1, Ex. B at 6.)  Ms. Dietelbach opined that Plaintiff "is able to perform very limited job duties because of several conditions," that "limit her ability to function in many work environments."  (Doc. No. 13 Attach. 1, Ex. B at 5.)  Ms. Dietelbach concluded that Plaintiff would be able to perform only sedentary work that required lifting a maximum of 10 pounds and only occasional standing and walking.  (Doc. No. 13 Attach. 1, Ex. B at 7.)  However, Ms. Dietelbach reported that her evaluation was based in part on Plaintiff's verbal complaints of pain with all activities, and that Plaintiff "exhibited doubtful behavior" during "all testing procedures because of chemical sensitivities and air freshness in [the] clinic, per patient's report."  (Doc. No. 13 Attach. 1, Ex. C at 3.)  Ms. Dietelbach further reported that "Testing procedures required modification because of [Plaintiff's] deconditioning, refusal to participate and refusal to touch certain objects."  (Doc. No. 13 Attach. 1, Ex. C at 4.)

### C.    Plaintiff's Subjective Statements from Her Function Report

In her function report, Plaintiff alleged the following.  Plaintiff's impairments interfere with her ability to dress, bathe, shave, care for her hair, use silverware, and prepare meals.  (Tr. 215.)  She experiences heart pain upon exertion, is unable to drive, has difficulty opening some doors, cannot handle coins, and must avoid electricity.  (Tr. 216-17.)  She is unable to go out alone or attend social events.  (Tr. 217.)  Plaintiff's mother helps Plaintiff with shopping, meal preparation, and household chores.  (Tr. 215,

19

221.)  Plaintiff's thyroid disorder causes her headaches, a slower thought process, and difficulty understanding, concentrating, remembering, completing tasks, and talking. (Tr. 223.)

### D.    Hearing Testimony

Plaintiff did not appear at her hearing, but a VE appeared and testified.  (Tr. 12-17.)  The ALJ posed the following hypothetical person to the VE:

> Assume a person has the ability to perform light work with occasional climbing of ramps and stairs only; balancing, stooping, crouching and crawling and kneeling; limited to simple, routine, repetitive tasks not performed in a fast-paced production environment, involving only simple, work-related decisions and in general relatively few workplace changes.

(Tr. 14-15.)  The VE testified that such a person could not perform Plaintiff's past relevant work.  (Tr. 15.)  The ALJ then asked whether such a person with Plaintiff's age, education, and work experience could perform other work that exists in significant numbers in the national economy.  (Tr. 15.)  The VE testified that such a person could perform work as an office cleaner (260,000 positions nationally), hotel/motel cleaner (128,000 positions nationally), and light stock clerk (193,000 positions nationally).  (Tr. 15.)  The VE testified that his testimony was consistent with the descriptions in the Dictionary of Occupational Titles.  (Tr. 16-17.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) and 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) and 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbott*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) and 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) and 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), and 416.920(g).

## IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.  The claimant meets the insured status requirements of the Social Security Act through September 30, 2003.

2.  The claimant has not engaged in substantial gainful activity since September 1, 2000, the alleged onset date.

3.  The claimant has the following severe impairments: back disorder, bipolar disorder, Hashimoto's thyroiditis, and right knee impairment.

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.  After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work . . . except no more than occasional climbing (ramps/stairs only), balancing, stooping, crouching, crawling, or kneeling; limited to simple, routine, repetitive tasks, not performed in a fast-paced production environment, involving only simple, work-related decisions and in general, relatively few work place changes.

6.  The claimant is unable to perform any past relevant work.

. . . . .

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2000 through the date of this decision.

(Tr. 46-52.)

22

## V.     LAW & ANALYSIS

### A.     Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Social Security*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, nor weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

Although *pro se* plaintiffs enjoy the benefit of a liberal construction of their pleadings and filings, *Boswell v. Mayer*, 169 F.3d 384, 387 (6th Cir. 1999), this Court is not required to make a *pro se* plaintiff's arguments for her.  Such a mandate would

23

"require the courts to explore exhaustively all potential claims of a *pro se* plaintiff, . . . [and] would . . . transform the district court from its legitimate advisory role to the improper role of an advocate seeking out the strongest arguments and most successful strategies for a party."  *Crawford v. Crestar Foods*, No. 98-3144, 2000 WL 377349, at *2 (6th Cir. 2000).

### B.    Whether the Commissioner's Final Decision is Based on the Proper Legal Standards

Plaintiff has offered a variety of contentions relating to whether the ALJ applied the proper legal standards in his assessment of Plaintiff's treating sources and RFC, and in his determination of whether Plaintiff could perform other work.  For the reasons set forth below, all of Plaintiff's contentions lack merit.

### 1.    Plaintiff's Contentions Regarding Treating Sources

Plaintiff argues that the ALJ incorrectly found that "no treating source has opined that [Plaintiff] is disabled" (*see* Tr. 51); the ALJ failed to consider Dr. Jurenovich's reports; and the ALJ improperly gave little weight to Dr. Brooks's opinions.  (Pl.'s Reply 11.)  Plaintiff's first two contentions are not accurate and Plaintiff's third contention is not persuasive.

A review of the record evidence reveals that the ALJ was correct when he noted that no treating source opined that Plaintiff was "disabled."[14]  Moreover, the ALJ

---

[14]  Even if a treating source had determined that Plaintiff was "disabled," such an opinion would not be dispositive of Plaintiff's disability status because statements from a medical source that a claimant is "disabled" or "unable to work" are not medical opinions, but are rather comments on a determination reserved to the Commissioner and, therefore, are not entitled to controlling weight or special significance.  20 C.F.R. § 404.1527(e); S.S.R 96-5p, 1996 WL 374183, at *1 (1996).

24

considered Dr. Jurenovich's opinions—the ALJ noted that Dr. Jurenovich diagnosed Plaintiff with a torn meniscus with effusion, but that Dr. Jurenovich noted that x-rays were negative, Lachman and drawer maneuvers were negative, and Plaintiff had been "doing well."  (Tr. 49.)  And, although Dr. Brooks indicated that Plaintiff should be relegated to sedentary work because of her knee, the ALJ properly gave this opinion little weight because it was dated from 1997 and was not supported by objective medical evidence or treatment records.[15]  (Tr. 51.)  *See Young v. Sec'y of Health & Human Servs., 925 F.2d 146, 151 (6th Cir. 1990)* ("The opinion of a treating physician must be based on sufficient medical data.")  Accordingly, these assignments of error lack merit and are not bases for remand.

### 2.      Plaintiff's Contentions Regarding the ALJ's RFC Assessment

Plaintiff argues that the ALJ's RFC assessment was erroneous because the ALJ was not familiar with Hashimoto's Thyroiditis and mercury toxicity and did not consider how these impairments affected Plaintiff in combination.  (Pl.'s Reply 14.)  Plaintiff provides no basis to conclude, however, that the ALJ was ignorant of the nature of Plaintiff's impairments or that any such ignorance was relevant to the ALJ's assessment of the information provided in the record evidence.  Moreover, Plaintiff's allegation that the ALJ did not consider Plaintiff's impairments in combination is not accurate, as the ALJ stated that he considered Plaintiff's impairments in combination (Tr. 47) and based

---

[15]  Plaintiff also contends that Dr. Brooks's letter wherein he articulated his opinion was supported by a "clinical test," and that if Plaintiff were granted remand, she could submit evidence of the alleged clinical test to support Dr. Brooks's opinion.  (Pl.'s Reply 11.)  This contention does not bear on the question of whether the ALJ's assessment of Dr. Brooks's opinions was proper based on the evidence that was before him.

his determination of Plaintiff's RFC on all of Plaintiff's symptoms and the record as a whole (Tr. 48).  Accordingly, these assignments of error lack merit and are not bases for remand.

### 3.      Plaintiff's Contentions Regarding Other Work

The ALJ based his determination that Plaintiff could perform other work on the VE's testimony, which was given in response to a hypothetical posed by the ALJ.  (Tr. 14-15, 52.)  Plaintiff argues that the ALJ's hypothetical to the VE did not accurately portray Plaintiff's impairments because:  (1) the ALJ indicated that Plaintiff had only a high school education when she actually had a bachelor's degree (Pl.'s Reply 8); (2) the ALJ included in his hypothetical, and the VE considered, only Plaintiff's past work experience and not her medical impairments and their severity (Pl.'s Reply 8); and (3) "Dr. Brooks's Report . . . and . . . the Cleveland Clinic Foundation Emergency Room's Report contradict the vocational expert's statement that Plaintiff can perform other work," as "Dr. Brooks' diagnosis of bilateral chondromalacia was made clinically" (Pl.'s Reply 1).  Plaintiff's first two contentions are not accurate and Plaintiff's third contention is not persuasive.

Plaintiff's allegation that the ALJ's hypothetical included an incorrect articulation of Plaintiff's education is not accurate because the ALJ elicited from the VE during the hearing that Plaintiff had a college education and included that education in his hypothetical to the VE by stating that the hypothetical person to which the VE would testify had *at least* a high school education.  (Tr. 14.)  Moreover, a person with a bachelor's degree has greater employment options than an individual with a high school education.  Plaintiff, therefore, would not be prejudiced by the hypothetical.

26

Plaintiff's allegation that the ALJ considered, and the VE based his testimony only on Plaintiff's past work experience and not her medical impairments and their severity is not accurate.  The ALJ's hypothetical to the VE was based, in part, on the ALJ's RFC assessment (Tr. 14-15), and the ALJ's RFC assessment was based, in part, on Plaintiff's medical impairments and their severity (*see* Tr. 48-52).

Finally, Plaintiff's mere observation that Dr. Brooks diagnosed Plaintiff with bilateral chondromalacia does not contradict the VE's testimony that Plaintiff could perform other work because the mere diagnosis of an impairment says nothing about the severity of that impairment and how it limits a claimant's ability to perform work. *See Young v. Sec'y of Health & Human Servs*., 925 F.2d 146,151 (6th Cir. 1990) ("This court has determined that a claimant must do more to establish a disabling mental impairment than merely show the presence of a dysthymic disorder."); *Bradley v. Sec'y of Health & Human Servs*., 862 F.2d 1224,1227 (6th Cir. 1988) (explaining that signs of arthritis are not enough; the claimant must show that the condition is disabling).

In sum, Plaintiff has not provided any basis for concluding that the ALJ's hypothetical to the VE did not accurately portrayed Plaintiff's impairments.  Therefore, these assignments of error lack merit and are not bases for remand.

## C.     Whether Substantial Evidence Supports the ALJ's Decision

Plaintiff's argument that the ALJ's decision is not supported by substantial evidence is articulated by Plaintiff in a handful of different ways throughout her Brief on the Merits and Reply Brief.  Plaintiff supports her argument by generally describing the contents of her medical records and:  (1) noting how the records show that she suffers

certain impairments; (2) alleging that some of her medical records were "erroneous"[16] (Pl.'s Br. 5),"not accurate"[17] (Pl.'s Reply 2), "false" (Pl.'s Reply 4, 7-8), a "sham" (Pl.'s Br. 6), or "lies" (Pl.'s Reply 8); and (3) asserting that substantial evidence supports the conclusion that she is, in fact, disabled (Pl.'s Br. 8).  For the reasons set forth below, this assignment of error lacks merit.

Although Plaintiff suggests that the ALJ's factual findings were inaccurate because the medical records on which the ALJ relied to make his decision were erroneous, inaccurate, or falsified, there is simply no basis to conclude that any medical records were erroneous, inaccurate, or falsified.  And Plaintiff's argument that the ALJ's decision is erroneous because substantial evidence supports the conclusion that Plaintiff is actually disabled will not avail Plaintiff because the argument is based on an incorrect legal standard; a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy, 594 F.3d at 512*.

The ALJ's decision is supported by substantial evidence.  The ALJ considered Plaintiff's knee pain, back pain, bipolar disorder, Hashimoto's Thyroiditis, and alleged heavy metal toxicity in his RFC assessment.  (Tr. 49-50.)  Despite Plaintiff's subjective

---

[16]  Plaintiff insists that she has never had bi-polar disorder (Pl.'s Br. 5; Pl.'s Reply 7), even though the ALJ included further limitations from her bipolar disorder in his RFC assessment (*see* Tr. 50).

[17]  Plaintiff explains that she ingested "supplements" before many of her medical examinations, and seems to suggest that any results from those examinations indicating that she was functioning relatively well are inaccurate because the "supplements" were allowing her to perform at an artificially high level.  (Pl.'s Reply 2, 3, 4, 6, 9, 10.)  There is no evidence in the record to support these allegations.

28

statements of her limitations, the ALJ noted the following.

As to Plaintiff's knee pain, Dr. Jurenovich reported that Plaintiff had a torn meniscus but recovered from it well.  (Tr. 49.)  Dr. Jurenovich also reported that Plaintiff refused cortisone injections for her knee pain.  (Tr. 49.)  Moreover, Plaintiff's physical therapist reported that Plaintiff had normal range of motion and strength in her right knee, was over-dependent on her crutches, and demonstrated a fair response to walking along parallel bars without her crutches.  (Tr. 49.)

As to Plaintiff's back pain, Dr. Cerimele diagnosed Plaintiff with only minimal lumbosacral dysfunction and indicated that Plaintiff had full manual motor strength in the lower extremities.  (Tr. 49.)  Moreover, Plaintiff's chiropractor reported that Plaintiff had no limitations in her ability to use her extremities for functional tasks or for performing fine and gross manipulation.  (Tr. 49.)

Although the record indicates that Plaintiff had been hospitalized only once for a severe thought disturbance that was diagnosed as bipolar disorder and there was no evidence of subsequent treatment, the ALJ construed the evidence in the light most favorable to Plaintiff by adding additional limitations to Plaintiff's RFC based on bipolar disorder.  (Tr. 50.)

Although there was conflicting evidence regarding Plaintiff's thyroid disorder, the ALJ construed the evidence in the light most favorable to Plaintiff by adding additional limitations to Plaintiff's RFC based on a thyroid disorder.  (Tr. 50.)

There was conflicting evidence regarding whether Plaintiff suffered heavy metal toxicity; namely, whether Plaintiff had high levels of cadmium.  (Tr. 50.)  However, despite Plaintiff's subjective statements of how her alleged heavy metal toxicity limited

her, Plaintiff delayed having her fillings—the apparent source of the heavy metal toxicity—replaced.  (Tr. 50.)  Therefore, the ALJ determined that the record reflected no more than minimal limitations on Plaintiff's ability to work based on temporarily high levels of cadmium.  (Tr. 50.)

As to opinion evidence, the ALJ determined that no treating source opined that Plaintiff was disabled.  (Tr. 51.)  The ALJ gave Dr. Brooks's opinion that Plaintiff was limited to sedentary work little weight because it was dated from 1997 and was not supported by objective medical evidence or treatment records.  (Tr. 51.)  The ALJ also rejected the state agency opinion of Plaintiff's physical RFC (which was less restrictive than the ALJ's RFC) because that RFC did not adequately reflect Plaintiff's exertional limitations, and rejected the state agency opinion of Plaintiff's mental RFC because it was incomplete.  (Tr. 51.)

The ALJ gave great weight to the consultative examiner's opinion that Plaintiff's ability to lift was limited because it was based on objective medical evidence and was consistent with the other evidence in the record; and he gave great weight to the chiropractor's opinion that Plaintiff had no limitations in her ability to use her extremities or perform fine and gross movements because, although a chiropractor is not an acceptable medical source, the chiropractor was trained in the ability to recognize functional limitations arising from musculoskeletal impairments and had the opportunity to examine and observe Plaintiff.  (Tr. 51.)

The Court concludes that the ALJ adequately reviewed the record as a whole, and that his decision is based on sufficient relevant evidence that reasonably supports his decision; that is, the ALJ's decision is supported by substantial evidence.

### D.    Plaintiff's Additional Evidence

Plaintiff argues that remand for another hearing is warranted pursuant to sentence six of 42 U.S.C. § 405(g) because she has additional medical evidence obtained after the ALJ made his decision that proves she is "disabled and unemployable."  (Pl.'s Reply 9.)  Sentence six of 42 U.S.C. § 405(g) permits a court to remand a case to the Commissioner when there is additional evidence that was unreviewed in the prior proceeding, but only when the additional evidence is new and material, and when there is good cause for the failure to incorporate that evidence into the record at the prior proceeding.  42 U.S.C. § 405(g); *Hollon v. Comm'r of Soc. Sec.,* 447 F.3d 477, 483 (6th Cir. 2006).  The party seeking remand bears the burden of showing that remand is appropriate.  *Hollon,* 447 F.3d at 483.  Plaintiff's additional medical evidence constitutes the May 25, 1991, discharge report from St. Elizabeth Hospital Medical Center, Dr. Nichols's letter dated July 26, 2010, and Ms. Dietelbach's RFC assessment dated July 27, 2010.

Plaintiff also mentions in her briefs that she suffered "new" injuries in 2005 after she was allegedly struck in the eye by a Lance Armstrong wristband, which causes continuous pain and blurred vision (Pl.'s Reply 9-10), and in 2008 after she allegedly, accidentally got her hand stuck in a washing machine (Pl.'s Reply 5).  Plaintiff explains that the limitations those injuries impose cannot be tested because she is sensitive to electricity and testing could be fatal.  (Pl.'s Reply 5, 9.)

Plaintiff does not mention or explain the significance of the May 25, 1991, discharge report from St. Elizabeth Hospital Medical Center.  Nor does Plaintiff provide any documentation in support of her claims that she suffered "new" injuries in 2005 and

2008, or any explanation for why such evidence was not included in proceedings before the Social Security Administration.  Therefore, Plaintiff has failed to meet her burden of showing that remand is appropriate to consider the discharge report or any evidence of her "new" injuries.

Furthermore, Plaintiff has failed to show good cause for failing to obtain and incorporate Dr. Nichols's letter and Ms. Dietelbach's RFC assessment into the record at her prior proceedings before the Social Security Administration.  A claimant shows "good cause" by demonstrating a reasonable justification for the failure to acquire and present the evidence for inclusion in the hearing before the ALJ.  *Hollon*, 447 F.3d at 485.  Plaintiff argues that she has shown good cause because she "could not locate a doctor who understood [her] hypothyroid disorder and musculoskeletal problems."  (Pl.'s Reply 14.)  As this explanation is wholly unsubstantiated, it is insufficient to show "good cause."  Accordingly, remand under sentence six is not warranted.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED, and that judgment be entered in favor of the Commissioner.

s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: June 22, 2011

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1).  Failure to**

file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).